## PROVIDENT TRUST CO. OF PHILADELPHIA v. METROPOLITAN CASUALTY INS. CO. OF NEW YORK.

### Nos. 8846, 8847.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 5, 1945.

Decided Dec. 17, 1945.

Writ of Certiorari Denied March 11, 1946.

See 66 S.Ct. 810.

---

[1] Revenue Act of 1936, c. 690, 49 Stat. 1648.

Revenue Act of 1938, c. 289, 52 Stat. 447.

[2] See Note 1.

Lewis M. Stevens, of Philadelphia, Pa. (Sydney S. Stern, Philip Sterling, and Stradley, Ronon, Stevens & Young, all of Philadelphia, Pa., on the brief), for appellant.

William Clarke Mason, of Philadelphia, Pa. (Clinton W. Frontz, A. Allen Woodruff, and Morgan, Lewis & Bockius, all of Philadelphia, Pa., on the brief), for appellee.

Before ALBERT · LEE STEPHENS, MARIS, and GOODRICH, Circuit Judges.

GOODRICH, Circuit, Judge.

This case arises on appeal from two District Court judgments,[1] against a surety on three completion bonds in the aggregate amount of $868,264.79. Both cases are factually alike and present identical questions of law.[2] The persons involved are: Provident Trust Company of Philadelphia, plaintiff; Metropolitan Casualty Insurance Company of New York, defendant; and Equitable Bonded Indemnity Company with its wholly owned subsidiary, Equitable Securities Corporation. From the business operations of the Equitable companies with certain builders, Furman, Roehm and Storck and their surety, the defendant Metropolitan, on the one hand, and the plaintiff Provident on the other, the present conflict of interests arose.

The case is in Federal Court on diversity grounds only. All the operative facts seem to have had their setting in Pennsylvania. Under the now well understood and established rule, Pennsylvania law is to be applied and Pennsylvania decisions, so far as found to be applicable to the questions in the case are controlling.[3]

The defendant's principal and most important point, while presented with considerable elaboration, brings the case down to a simple set of facts which, in turn, is controlled by simple and well settled propositions of law. The substance of the case on the defendant's theory is this: A builder undertakes certain operations. In the

---

[1] One judgment was for $457,012.31 representing the full amount of two unpaid loans less a credit of $300 plus 3% interest for a little over 15 years; the other judgment was for $411,252.48 representing the full amount of Debenture Bonds, less a credit of $200 plus 3% interest for more than 15 years.

[2] The purely nominal difference is that in one case, plaintiff sues in an individual capacity on two of the bonds, and in the other case, it sues as trustee on the remaining bond.

[3] The decision referred to by appellee as presenting a case (Baglin v. Title Guaranty Surety Co., C.C., 166 F. 356, affirmed, 3 Cir., 1909, 178 F. 682) "so nearly identical" was decided long before Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, was ever dreamed of. A Federal Court decision upon a question of state law settled upon principles of "general commercial law" is no precedent now.

language of suretyship, he is the principal debtor. He is to be supplied with money by a creditor, in this instance Equitable. A completion bond is given by the defendant surety. With the consent of the principal debtor and surety, rights of the creditor (Equitable) are assigned to plaintiff Provident Trust Company. The principal debtor's project is never completed because the creditor (Equitable) fails to advance the funds promised. This failure excuses the debtor from its performance.[4] Since the principal debtor is not in default upon his performance, his surety is likewise not in default. Therefore the creditor (Equitable) cannot recover against the surety.[5] Provident is but the assignee of the creditor and the rights of the assignee rise no higher than the assignor.[6] Judgment must, therefore, be for the defendant. If the defendant is right in its argument that the facts in the instant case are essentially those in the statement just made, it is perfectly clear that it is right in its legal conclusion. Indeed, the plaintiff would not claim to the contrary.

The plaintiff, however, claims and got the District Judge to go along with the claim, that it is not the assignee of a contract made by the defendant with Equitable but the contract is essentially one with the plaintiff itself. Its rights are not, therefore, derived by assignment from Equitable, but are obligations running directly from defendant to plaintiff. Of course, if this is the substance of the transaction, the view set out above has no application. There were no conflicts of testimony to be resolved at the trial. Most of the facts were stipulated and the testimony of the one witness, A. G. Scattergood, Vice-President of the plaintiff, was not disputed but relied on by the defendant. Our question becomes, therefore, what is the legal conclusion to be drawn from facts rather than what are the facts themselves.

■ Are the plaintiff's rights based on an obligation running directly to it or do they arise only by assignment from Equitable? Plaintiff contends,[7] and the District Court agreed, that Provident was a direct obligee. The facts upon which this conclusion is based are these: the surety knew that Provident and not Equitable was to be the ultimate recipient of the bonds;[8] the bonds, assignment and consent to assignment were bound together as though they were a single document;[9] the whole trans-

---

[4] Restatement Contracts, § 274(1) "In promises for an agreed exchange, any material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange even though his promise is not in terms conditional." Pennsylvania Annotations § 274(1), in accord, cites a great variety of cases.

[5] Restatement Security § 126 "Where there is a promise for an agreed exchange between creditor and principal and there is a material failure of performance by the creditor not justified by the conduct of the principal, the surety is not liable to the creditor unless the principal has elected to treat the failure only as a partial breach." Pennsylvania Annotations § 126, "Accord: Gunnis v. Weigley, 1886, 114 Pa. 191, 6 A. 465." See also: McShain v. Indemnity Insurance Co. of North America, 1940, 338 Pa. 113, 12 A.2d 59; Young v. American Bonding Co., 1910, 228 Pa. 373, 77 A. 623.

[6] Restatement Contracts § 167(1) "An assignee's right against the obligor is subject to all limitations of the obligee's right, to all absolute and temporary defenses thereto and to all set-offs and counterclaims of the obligor which would have been available against the obligee had there been no assignment, provided

that such defenses and set offs are based on facts existing at the time of the assignment, or are based on facts arising thereafter prior to knowledge of the assignment by the obligor." Pennsylvania Annotations § 167(1) in accord, cites a number of cases.

[7] Plaintiff's theory is that the "primary purpose of the surety bonds was to protect Provident" and "the 'assignment' in the bonds was an 'assignment' in name only."

[8] The District Court points out that " * * * in the Storck transaction the builder's application to the defendant for the surety bond contains the question and answer, 'To whom to be given?' 'Provident Trust Co., Trustee'—a fact which makes the defendant's knowledge of the real nature of the transaction even plainer than in the other case." The Court adds, "The plaintiff's vice president testified that, without the bond, the loan would not have been made."

[9] The single document view rests on this in the District Court's own wording: "The bond and assignment, with a statement of the defendant's financial condition and a power of attorney authorizing the execution of the bond, were bound together and backed by a single office backer of the defendant."

action was consummated in a single day (except for advances of money) so that Equitable was only a fleeting holder of the instruments which were immediately transferred to Provident; the assignment was executed and consented to even before the bonds were delivered to Equitable;[10] and finally defendant's statement that the principals were straw men.[11] This we think is a fair summary of the points relied upon by plaintiff and sustained by the District Court to show an obligation direct to plaintiff.

But since we are here dealing with obligations arising out of words used by the parties, we had better give attention to the language they used, unless we are to put the cart before the horse. If that language is ambiguous, we may, of course, go behind it and examine the cartload of surrounding facts to try to find out what was meant. As might well be expected of large financial organizations skilled in their calling, and advised by able counsel, the language is clear and to the point. It is plainly the language of assignment. The bonds refer to Equitable and its subsidiary as "obligees." The assignments say that Equitable does "grant, bargain, sell, transfer, assign and set over" to Provident. They speak of the bond "so assigned" and of "this assignment" to Provident. They provide that if the mortgages be reassigned to Equitable, Provident will also "re-assign" its rights under the bond. Metropolitan and the builders state, "We hereby consent to the above assignment." The pleadings by Provident speak of defendant surety having "executed its written consent to a certain written assignment" to plaintiff. It is further expressly stipulated that Metropolitan as surety and the builders as principals, "executed their written consent to a certain written assignment to Provident." And the plaintiff sues as assignee of a contract, not one praying for reformation of an instrument. This is clear, exact, accurate. Neither we nor Judge Learned Hand's twenty bishops could change its plain meaning.[12] We have no case of mistake here, nor reliance by one party on the superior skill or knowledge of the other, no dominant bargaining agency which has imposed its will on a weaker party by hiding the real nature of the transaction through language formed to its own advantage,[13] nor any

---

[10] This does not amount to a technical flaw in the assignment, however. For while the assignments and consents were executed before the bonds were delivered to Equitable, that delivery nonetheless preceded delivery of the assignments to Provident. Thus when the documents were handed to Equitable the bonds became effective by delivery and when "thereafter" as is stipulated, the documents were handed to Provident the assignment became effective by delivery. And in any event, even if the assignment had become effective before the bonds were delivered, the latter would still have been assignable as future interests. East Lewisburg Lumber & Mfg. Co. v. Marsh, 1879, 91 Pa. 96; Ruple v. Bindley, 1879, 91 Pa. 296; Citizens Trust & Surety Co. v. Howell, 1902, 19 Pa.Super. 255.

[11] The District Court states, "In the affidavit, filed in support of a motion to dismiss the action for want of prosecution and expressly incorporated in the written motion presented by the defendant's counsel, the following appears, 'The said principals designated in the said bonds were in fact only straw parties acting on behalf of the said obligee which controlled the actions and operations of the said principals and such method of operation by the obligees was or

should have been known to the plaintiff herein at the time of the assignment of the said bonds by the said obligees to the plaintiff herein.'"

[12] Judge Learned Hand in Hotchkiss v. National City Bank of New York, D. C., 200 F. 287, 293, affirmed, 1913, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115: "A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there was some mutual mistake, or something else of the sort."

[13] The District Court states, "But even where language is plain and unambiguous, there are many situations in which circumstances may be resorted to to show that a transaction is, in reality, something entirely different from what it appears to be." It cites as examples that a clause for "liquidated damages may be shown to be a penalty"; a "transfer, absolute on its face, may be shown to have been given for security only"; and a purported bailment lease shown to be a conditional sale. In all these instances courts cut through the transaction as the

other possible reason for disregarding a simple meaning clearly expressed.

Furthermore, we do not see that the various facts urged by the plaintiff to show that Provident was a direct obligee prove the conclusion. It was quite probable that Provident considered itself sufficiently protected as an assignee. The testimony of its vice president showed the company sometimes took obligations running directly to it. We have no doubt that in fact its officers knew the difference. We think the binding of all papers together is not a legally significant fact nor is the length of time Equitable held them before handing them over to Provident. The matter of the affidavit referred to above does not come within what has been said. It should be noted however that this was filed at an early stage in the proceedings among matters "intended to be proved" by defendant. It was before the answer and before the stipulations the parties entered into. We think it has no significance. Further, except for mutual mistake and reformation, the rule that contracts mean what they clearly say applies to both contracting parties.

There is one more problem which requires consideration. The plaintiff claims that the surety's obligation was an absolute one. It points out that the language of the condition of the bond is that "The buildings hereinbefore mentioned shall be fully constructed and completed in accordance with the plans and specifications above referred to." This, it says, is an absolute and unconditional promise to see that completion is accomplished. In Purdy v. Massey, 1932, 306 Pa. 288, 159 A. 545, 547, the Supreme Court of Pennsyl-vania was discussing language in a completion bond and its problem was whether the language used by the surety constituted the promisor a guarantor or whether the promise was merely to indemnify. The court concluded that the language was an affirmative covenant to "complete the building in the event of default by the principal." It was found that there was default by the principal and the surety was held. But the court was not holding the surety as anything more than a guarantor of performance by the principal debtor.

Of course, it is possible for a surety to contract that a thing will happen or that a given result shall be produced. We think it likely that ordinarily surety bonds are not so given because the ordinary concept of suretyship is that of one person backing up the performance of another.[14] The question is whether this particular bond, in the language quoted, creates a promise on the part of the defendant regardless of the default of anyone else. The surety company relies upon the Pennsylvania decision of Young v. American Bonding Co., 1910, 228 Pa. 373, 77 A. 623, 624. The plaintiff strenuously urges that this case is not in point and the District Court was led to agree with it.[15] If the Young case is in point we think it establishes the proposition that the words used in this type of bond which, in turn, contains a reference to a contract, makes performance of the surety's promise conditioned upon the nonperformance of the main contract by the principal debtor. If this case is in point it obviously governs us because, as stated above, the instant case is to be settled in accordance with Pennsylvania law. We quite realize that it is part of a mature system of law to make distinctions. Only

parties have written it. The purpose of forbidding a clog upon the equity of redemption is of course to protect a debtor against a dominant creditor. In the liquidated damage case there is the same element of public policy present plus the point that when parties are allowed to stipulate for damages at all they are, to some extent, substituting their own rules for those of the law. Obviously this is a privilege to be kept within limits. All these exceptions are inapplicable here, for this is but an ordinary bargain between strong and well advised business concerns. So long as they stay within the law they may deal as they please and neither needs the guardianship of a court.

[14] See Restatement Security § 82 and Comment thereto.

[15] The District Court says it does not think the Young case rules because: "The difference in the wording of the conditions of the two bonds may be noted. It is slight but not entirely without significance. In the Young case the condition was, 'if the said principals shall well and faithfully construct and complete * * *'. In the present case the condition is, 'That if the buildings hereinabove mentioned shall be fully constructed and completed * * *.'" The Court goes on to point out that the subsidiary facts of the Young case and the instant case are also "fundamentally entirely different."

an exceedingly primitive legal culture is unable, for instance, to distinguish between intentional killing and death through accident. But it is not part of a mature system of law to make distinctions without differences. We cannot see, upon this point, any difference between the American Bonding case and this one. We think the former decision controls. The conclusion of that control is that the defendant's liability was conditioned upon a default by the principal obligor, that is the builder. The builder was not in default because he had an excuse for non-performance. Neither is the surety.

This analysis of the case makes it unnecessary for us to consider the other arguments made by the defendant.

The judgments of the District Court are reversed.