**SCHUYLKILL TRANSIT CO. v. ROTHENSIES et al.**

**Civ. A. No. 12346.**

United States District Court
E. D. Pennsylvania.

June 18, 1953.

White, Williams & Scott, Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., William C. Thompson, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

GANEY, District Judge.

The action here concerned was brought by the taxpayer for the recovery of $193,834.78 claimed to have been erroneously paid by it as a portion of its income and excess profits taxes for the years 1943, 1944 and 1945.

In 1943, the taxpayer sustained a loss of $405,661.83 because the bonds of its wholly owned subsidiary became worthless. Broadly stated the question posed is whether that loss is deductible in full for 1943, pursuant to § 23(g) (2) of the Internal Revenue Code, as a loss resulting from the worthlessness of securities of an affiliated corporation within the meaning of § 23(k) (5) of the Code,[1] or is a capital loss which can be applied only against capital gains under § 117 of the Code. The answer to this question depends on whether the subsidiary's income under an agreement of December 29, 1913, with it and Schuylkill Railway Company, was income from rents within the meaning of § 23(k) (5) of the Code, as determined by the Commissioner of Internal Revenue, or income from sources other than rents, as contended by the taxpayer.

The taxpayer is a Pennsylvania corporation organized October 6, 1942, and is engaged in the business of transporting passengers by bus in Schuylkill County, Pa. On November 25, 1942, the taxpayer acquired, with other property, all of the outstanding stock and bonds of Schuylkill County Railway Company ("County Railway") in the principal amount of $419,000. On April 9, 1943, County Railway transferred its last remaining assets, valued at $13,338.17, to the taxpayer. As a result of the transfer, the unpaid principal balance of County Railway bonds then amounting to $405,661.83 became worthless.

At all times after December 29, 1913, more than 90 per centum of the aggregate of County Railway's gross income was derived under an agreement between it and Schuylkill Railway Company ("Railway"). County Railway and Railway were both Pennsylvania corporations engaged in the operation of electric railway lines in Schuylkill County, Pa. The significant features of the

1. As amended by § 124(a) of the Revenue Act of 1942, 56 Stat. 798, and § 112(b) of the Revenue Act of 1943, 58 Stat. 21, 26 U.S.C. (1946 Ed.) § 23(k) (5).

agreement, which was cast in the form of a lease,[2] were as follows:.

(a) Railway would assume the complete management and control of the rolling stock, railroad equipment and right of way of County Railway and would furnish the manpower to operate the system during the term of the agreement, and collect all the earnings to be derived from such operation.

(b) The gross earnings derived from the operation of County Railway's system would be "divided into two portions"; one portion consisting of 60 per centum, the other portion of 40 per centum.

(c) All expenses and liabilities incident to the operation of the system were to be deducted from the 60 per centum portion, and the balance remaining to be retained by Railway. Property taxes and interest on County Railway's outstanding bonds were to be paid out of the 40 per centum portion, and the remaining to be paid over annually to County Railway.

(d) Railway would guarantee the bonds issued by County Railway, but if the former were to be held liable on that guarantee, it was to have a right over against the latter by way of indemnity.

(e) County Railway was required to construct, at its expense, "branches or extensions and doubletrack improvements of its railway and acquire such additional rolling stock and equipment as may be necessary or required from time to time to meet the demands of business offering".

The agreement was carried out according to its terms, with the result that, for all practical purposes, the entire amount of County Railway's annual income for all taxable years since the date of the agreement was attributable to its receipt of the 40 per centum portion of the gross earning derived from Railway's operation of the system. Receipts varied over the years from a low of $5,000 in 1914, to a high of $71,000 in 1924. County Railway's books showed the receipts as "rental income", and Railway's accounting records reflected the payments as "rents of leased lines".

The taxpayer filed income and excess profits tax returns for 1943, 1944 and 1945. In its 1943 returns it treated the $405,661.83 loss from County Railway bonds as being fully deductible, and carried portions of that loss over into 1944 and 1945, the years in which it reported that no taxes were due because of the loss. For the three years involved, the Commissioner of Internal Revenue redetermined the taxpayer's returns and assessed additional income and excess profits taxes against the taxpayer. In his redetermination the Commissioner allowed the loss of $405,661.83 as a capital loss. This loss was applied first to off-set capital gains of $1,902.52 for 1943, leaving $403,759.31, which was applied as a capital loss carry-over to off-set capital gains of $1,198.27 for 1944, and $224.62 for 1945.

The taxpayer relies on subdivision (5) of § 23(k) of the Internal Revenue Code to support its claim that the loss in question is allowable as an ordinary fully deductible business loss for the calendar year 1943, and is, therefore, applicable as a net carry-over to 1944 and 1945. If that subdivision does not apply, then subdivisions (2) and (3) of § 23(k) operate to classify County Railway bonds as capital losses, allowable only to the extent of capital gains under § 117(d) of the Code.

Subdivision (5) of § 23(k) excludes from the meaning of the term capital

2. The agreement referred to itself as a "lease", to County Railway as "Lessor Company" and to Railway as "Lessee Company"; it provided that in consideration of "the rents hereinafter reserved" County Railway "has demised, let and leased" and "does demise, let and lease" its property to Railway. It also recites the authorizing resolutions of the stockholders and directors of County Railway, which resolutions grant authority to effect and execute a "lease", and the corresponding authorizing resolutions of Railway grant authority to accept a "lease".

assets for the purposes of subdivisions (2) and (3) securities issued by a corporation "affiliated" with the taxpayer, and imposes three conditions which a corporation must meet in order to qualify as an "affiliated" corporation. These three conditions are: (A) at least 95 per centum of each class of its stock must be owned directly by the taxpayer; (B) more than 90 per centum of the aggregate of its gross income for all taxable years must have been from sources other than royalties, *rents,* dividends, interest, annuities, or gains from sales or exchanges of stocks and securities; and (C) the taxpayer must be a domestic corporation.

The conditions of clauses (A) and (C) have been met by the taxpayer. It cannot be held to have met the requirements of clause (B) unless the income of County Railway under the 1913 agreement was income from sources other than those listed in that clause. It is the defendants' position, which poses the issue in this action, that County Railway's earnings under the agreement were rents within the meaning of clause (B), and that, therefore, County Railway was not affiliated with the taxpayer within the meaning of subdivision (5) of § 23(k).

In opposition the taxpayer contends that the meaning of the term "rents" as it appears in § 23(k) (5) (B) is to be interpreted in the strict sense as referring only to the payments made by a tenant to a landlord under the traditional lease of land and buildings, instead of in its more comprehensive sense to include compensation, however designated, for the use of or right to use property.

There is some merit to the taxpayer's contention.[3] Nevertheless, it seems to us that in this age of expanded business and the many forms under which it is conducted, when the term rents appears in the Internal Revenue Code, it is to be interpreted in its broader sense unless the contrary clearly appears.

To overcome the effect of this interpretation of § 23(k) (5) (B), the taxpayer asserts that the earnings derived by County Railway were not income from rents, but income from business. We disagree. The 1913 agreement, which throughout uses the terms and provisions of leases, clearly demonstrates that the parties intended to enter into a lease agreement. The taxpayer reminds us that the use of the terms "rents", "lease" and so forth in a written agreement do *not for that reason make payments under the agreement rents.* We agree that mere labeling is not controlling in the determination of the character of payments under an agreement. But even so, the designations used by the parties to an agreement to describe transactions are entitled to great weight in determining the true nature of those transactions. Provident Trust Co. v. Metropolitan Casualty Ins. Co., 3 Cir., 1945, 152 F.2d 875, 879.

In the action before us, the parties, in addition to making their intentions clear in the agreement, characterized the payments as being rents both in the agreement and in their accounting records. They not only intended that the payments were to be considered as rents, but such payments were in fact "rents" within the meaning of § 23(k) (5) of the Code. See § 29.22(a)–19 of Regulations 111. The fact that the payments were not fixed sums, that County Railway was required to improve or extend its railway system, or that it might become liable on its bonds to Railway by way of indemnity under the 1913 agreement does not alter the situation.

Accordingly, judgment may be entered in favor of the defendants.

---

3.  For example see § 23(a) (1) (A) of the Internal Revenue Code.